Filed 10/23/15  P. v. Shears CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065200 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD242689) |
| CHARLIE P. SHEARS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael T. Smyth, Judge.  Affirmed.

Mark David Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Sean M. Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

In November 2013, a jury found Charlie P. Shears, also known as Charzel Shears, guilty of three crimes committed on April 17, 1996, at the Moonlite Market in San Diego: first degree murder (Pen. Code,[1] § 187, subd. (a)) with personal use of a handgun (§ 12022.5, subd. (a)(1)) while engaged in the commission and attempted commission of robbery, a special circumstance (§ 190.2, subd. (a)(17)) (count 1, victim Sleiman Hallak); and two counts of premeditated attempted murder (§§ 187, subd. (a), 189) with personal use of a handgun (§ 12022.5, subd. (a)(1)) (count 2, victim Jimmy Shaw; count 3, victim Cleo Shivers). In December 2013, the court sentenced Shears to life in prison without the possibility of parole for first degree murder and consecutive terms of life in prison with the possibility of parole for each count of attempted murder. Shears appeals and raises two contentions. First, he contends a precharging delay of more than 15 years constituted a violation of due process; the delay caused alibi witness Gerald Dushone Young to be unavailable, prejudicing Shears; and the court erred by denying a delay based motion to dismiss. Second, Shears contends the court abused its discretion and violated his right to due process by admitting into evidence his admission he used a gun taken during the Moonlite Market crimes when he committed an unrelated crime on April 19, 1996, at the Foodland grocery store in National City. We affirm.

---

[1]    Further statutory references are to the Penal Code unless otherwise specified.

FACTUAL AND PROCEDURAL BACKGROUND

*1996*

Hallak owned the Moonlite Market. He kept two guns behind the counter. On the morning of April 17, 1996, Hallak was in the market with his employee, Shivers, and a cigar salesman, Shaw. Hallak and Shaw were near the cash register and Shivers was near the cooler. Between 10 a.m. and 10:30 a.m., a Black man entered the store. According to Shivers, he was approximately five feet five inches, or about Shivers's height (five feet eleven inches tall), and of medium build. Shaw saw the man for 20 to 30 seconds; according to Shaw, the man was between five feet six and five feet eight inches tall and of "real slim" build, between 130 and 140 pounds. The man's face was completely covered by a ski mask. The ski mask was dark, either blue or black. The man was wearing dark gloves, either blue or black, with something white, perhaps a stripe. He was wearing something plaid—a jacket, shirt or vest. Dark skin was visible around the eye holes of the ski mask, and on his wrist, between the glove and the shirt.

The man pulled a gun and repeatedly said to Hallak, "Give me the money." The man fired two shots. Shaw ran to the end of an aisle. He heard a third shot. He continued to the back of the market and knelt down. The counters blocked his view of the front of the market. He heard, "Give me the money, give me the money" then heard two more shots. The gunman went behind the counter and shot at Shivers, who had hit the floor when he heard the shots. The crimes were recorded on videotape.

One of the market's regular customers walked in and called to Hallak. Shivers got up, saw Hallak had been shot and called 911. Shaw went to the front of the store and saw

3

Hallak lying on the floor behind the counter. Hallak died at the scene from multiple gunshot wounds. During an autopsy, three bullets were recovered from his body.

A San Diego Police homicide team arrived at the scene around 10:30 a.m. on April 17, 1996. The team included Sergeant Alicia Lampert; Detectives Ronald Larmour, Felix Zavala and Len Morlan; and an evidence collection technician.[2]

Detective Larmour saw two new bullet holes inside the Moonlite Market, at the rear, near the cooler. The homicide team collected two bullets, one from the top shelf of a storage cabinet in the rear of the market and one from a display shelf. They found a nine millimeter magazine in a drawer.

During her investigation, Sergeant Lampert learned that Shears was a frequent customer of the Moonlite Market. On April 21, 1996, Sergeant Lampert learned that Mark Vasquez had information for the police and she and Detective Zavala interviewed Vasquez. Vasquez showed them Shears's identification card or driver's license, which Vasquez had taken from Shears's apartment (and later returned). Vasquez told Sergeant Lampert everything to which he later testified at trial, as described below.[3]

At the end of the interview, the police fitted Vasquez with a recording device and he went to Shears's apartment. Shears and Vasquez left the apartment together and were pulled over by the police and arrested. Vasquez was released and received clothing, food

---

[2] By the time of trial, Morlan and the evidence collection technician had died.

[3] While testifying at trial, Vasquez admitted he was nervous. He testified his memory was fresh in 1996, and any contradictions in his testimony were "due to the time frame."

and enough money from the Hallak family to return to Texas. He did not receive the reward offered for information regarding Hallak's killer. Nothing of evidentiary value resulted from recorded conversations between Shears and Vasquez.

Vasquez testified at trial that he had five felony convictions, all in 2008, three for tampering with evidence, one for violating a protective order and one for attempted robbery. Before April 17, 1996, he lived in Texas. Around April 17, he came to San Diego County with his acquaintance Damion Waldon. Through Waldon, Vasquez met Shears, who was Waldon's cousin. Vasquez, Shears and Waldon spent two days together and Vasquez stayed in Shears's apartment in National City for the second and third nights of his visit to San Diego County. When they drove by the Moonlite Market, Vasquez saw flowers by the door. Vasquez asked, "Is that a flower store?" Shears said "some Mexican got smoked" (killed) and "You don't even know . . . I might be involved in that." Shears said he might have loaded one of the weapons that killed the victim "they might be able to trace it back to him because his fingerprints were on the bullets." Shears said there were four people involved in the crime and at least two or three guns. The robbers wore gloves and ski masks. Shears's job was to load the weapons, go in the store with another person, see if anyone was inside, give the go ahead sign, act as a lookout and dispose of the evidence. When the robbers were getting the money, they saw guns and took them. "[T]hey" were not supposed to kill the guy, but it happened. Hallak reached for something that might have been a weapon, and as a result, he was shot twice. "[T]hey" stepped over another person in the market. Shears told Vasquez "everything else but that he was the killer."

5

Vasquez further testified that Shears told him he had thrown one of the weapons used in the crime off a pier at 24th Street. During the time Vasquez spent with Shears, Vasquez saw Shears in possession of a handgun and wearing gloves. The gloves were mismatched; one was predominately black, with white, and the other was predominately off-white, with black. Before Vasquez handled the gun, Shears had him put on the gloves. Shears said the gun was stolen from the Moonlite Market during the murder. One evening around April 19, 1996, while Vasquez was staying with Shears, Shears came home and said he had committed another crime with the gun. Shears's girlfriend and Waldon were also at the apartment. Vasquez heard on television that there was a $10,000 reward for information regarding the crimes at the Moonlite Market. He went to a grocery store and told an employee what he knew. Hallak's son Sarmad Hallak (Sarmad) arrived, followed by the police.

On April 22 and 23, 1996, the police interviewed Waldon. The police showed him a photograph of a gun and he identified it as the gun he had seen in Shears's possession. Waldon said that Shears told him he had acted as a look out during the crime.

At trial, Waldon testified as follows. He had been in jail, but had never been convicted of a felony. In 1996, Shears told Waldon he had acted as a look out in the robbery of the Moonlite Market. Shears said he was scared. Someone had been killed during the robbery and by the time Shears got to his look out spot, people were rushing out of the market. The people who went into the market were mad at Shears. Shears did not get anything but a gun stolen from Hallak. Shears showed Waldon the gun on

6

April 23, 1996. Waldon's memory of the events was fresher in 1996 than it was on the date of trial.

On April 22, 1996, Sergeant Lampert obtained a search warrant for a National City apartment where Shears was believed to reside. In her affidavit for the warrant, Sergeant Lampert stated that Shaw had told Detective Zavala that he believed the shooter was approximately five foot six inches to five feet seven inches tall. When Detective Larmour and others executed the search warrant, they found a pair of gloves; one glove was solid black and the other was "half black and a dirty white." They also found "a predominantly white glove with gray and black." They found a pair of men's black pants with a California identification card in the name of Charzel Shears in the pocket and other documents bearing his name. They found a black pullover jacket with a pouch containing a pair of "[p]redominantly black and white" gloves. Finally, the police found a loaded nine millimeter gun with the safety off.

After the search, Shears was arrested. Detective Zavala completed an arrest report with information Shears provided. Shears said he was five feet 11 inches tall and weighed 175 pounds. According to police reports, Shears was between five feet 11 inches and six feet one inches tall. Detective Zavala observed that Shears was of medium build.

Between April 22 and 23, 1996, Sergeant Lampert and Detective Zavala interviewed Shears twice. During the interviews, Sergeant Lampert showed Shears a photograph of the firearm recovered from the National City apartment. Shears admitted that on April 19, 1996, he had committed a crime using that gun.

On April 23, 1996, Detective Larmour and Sergeant Lampert interviewed Waldon. Detective Larmour asked whether Shears had given him any information concerning the robbery of the Moonlite Market. Waldon told Detective Larmour that Shears had told him the following. "[T]he guy that shot [Hallak] gave [Shears] the gun." They went to a restaurant and argued. Shears was upset because Hallak had been shot and killed. Shears said four people committed the robbery and homicide. Shears was supposed to get a cut of the money, but the shooter had all of the money and nobody got a cut. Detective Larmour showed Waldon a photograph of the gun and Waldon identified it as the one that Shears had.

On April 23, 1996, Hallak's son, Sarmad, identified the gun recovered from the apartment as his father's gun. Sarmad said the gun was missing from the Moonlite Market. On April 25, 1996, Shivers viewed a lineup that included Shears. Shivers was unable to identify the gunman.

B

*2001 and Later*

Virginia Gracia Shears (Mrs. Shears) and Shears began living together in 2001.[4] They stopped living together in July or August 2004 but continued seeing each other. Between May 2004 and the time they separated, they went together to the Washington Street Market in El Cajon. After they left the Washington Street Market, Shears told Mrs. Shears he recognized someone there as the son of the man who had been killed in

_____

4     They married in September 2012, after Shears was charged in this case.

8

the Moonlite Market robbery. Shears said because he had been accused of the crime, he did not want the son to see him. Shears said he had been caught because his cousin Waldon ratted him out. On previous occasions, Shears had mentioned the Moonlite Market robbery to Mrs. Shears, but had not said he had been involved in it. Someone else had said Shears had been in possession of the gun taken from the Moonlite Market. Mrs. Shears told people that Shears had been involved in a robbery.

On November 23, 2005, private investigator Peter Griffin, retained by the Hallak family's attorney, interviewed Mrs. Shears by telephone. Griffin testified that Mrs. Shears described herself as Shears's former fiancée and stated the following during the interview. Shears was the shooter in the Moonlite Market robbery. He claimed he was part of a three-man team that committed the robbery, but he was not the shooter. In July 2005, Mrs. Shears and Shears went into the Washington Street Market in El Cajon. Shears turned and ran out. When Mrs. Shears went outside, Shears told her that he had seen Hallak's sons, he had ended up with Hallak's gun as a souvenir, and he had been convicted of possessing that gun. Shears made contradictory statements about his involvement in the crime. Mrs. Shears was tired of hearing him brag and accused him of being a follower, not a leader. He responded that he had planned the Moonlite Market

robbery, he was the shooter and he had thrown the gun into Mission Bay. Shears believed that his cousin "[Waldon]" had ratted him out.[5]

At trial, Mrs. Shears testified she had lied to Griffin about some things. She had not told Griffin that Shears had said the Moonlite Market robbery was his idea and he had planned it. She told Griffin Shears was not the shooter and was not even at the Moonlite Market. The day after the November 2005 interview, Shears and Mrs. Shears reunited.

Detective Lynn Rydalch interviewed Mrs. Shears by telephone on November 30, 2005. The interview took place before Detective Rydalch had reviewed Griffin's report. Mrs. Shears said Shears was the person who had shot and killed the owner of the Moonlite Market. She based this on conversations she had had with Shears and conversations she had heard him have with others over a five-year period. Mrs. Shears told Detective Rydalch the following. When she accused Shears of being a follower, he asked why she thought he wasn't the one who came up with the idea to rob the Moonlite Market. Shears admitted the robbery was his idea, although Mrs. Shears could not remember his exact words. Shears said he was "shermed out" when he did it, which led Mrs. Shears to infer that he was the one who had "pulled the trigger." Shears kept one of the guns from the Moonlite Market as a souvenir and threw the gun used in the murder over a bridge near Crown Point. In October, Shears said he would have gotten away with it if "[Waldon]" had not called the police.

_____

[5]    On November 23, 2005, Griffin forwarded his report to Sergeant David Johnson of the San Diego Police Department homicide unit. Detective Rydalch followed up on the report.

10

On May 13, 2010, San Diego Police Sergeant Anthony Johnson of the cold case team interviewed Mrs. Shears in person regarding an unrelated case. Mrs. Shears said that Shears was not involved in the unrelated case; he was involved in the Moonlite Market murder but was not the shooter. Sergeant Johnson was aware of the Moonlite Market case but did not know the details. Mrs. Shears's comment took him by surprise because she seemed so open and forthright. Sergeant Johnson had a total of seven conversations with Mrs. Shears between May 13 and 20, 2010. On May 20, after Sergeant Johnson had reviewed reports from Griffin and Detective Rydalch, he broached the subject of Mrs. Shears's statement to Griffin that she had accused Shears of being a follower and he had claimed responsibility for planning the Moonlite Market robbery and committing the murder. Mrs. Shears told Johnson that although the rest of Griffin's report seemed accurate, Shears was not smart enough to have planned those crimes and was not the shooter, although he was a participant.

Mrs. Shears testified that during the May 2010 interview she admitted that everything she had said in the November 2005 interview was true except the part about Shears being the shooter. Johnson asked Mrs. Shears if she was a disgruntled girlfriend, saying things to get Shears in trouble. Mrs. Shears said no, she did not say things because she was disgruntled, and repeatedly told Johnson she was telling the truth. At trial, Mrs. Shears testified that she had in fact been disgruntled during the May 2010 interview. She also testified that someone other than Shears had told her Shears was at the Moonlite Market but he was not the one who pulled the trigger. She testified that she knew about the reward but never collected any reward money.

11

In February 2011, a deputy district attorney and Detective Rydalch interviewed Vasquez while he was in custody in Texas. The deputy district attorney and Detective Rydalch spoke to Vasquez without allowing him to view the tape of his April 1996 interview with Sergeant Lampert. Vasquez stated the following. He always saw Shears with a gun, but Shears had not said where he had obtained it and had not said anything about guns. Shears talked about the murder almost immediately upon meeting Vasquez. Vasquez did not hear Shears say he was involved in the murder, but Vasquez believed Shears was involved because he knew so much about it. After Vasquez was allowed to review the recording of his April 1996 interview, he said Shears had said he and three other people were involved in the crime and his fingerprints might be on the bullets. Vasquez said part of his motivation was to receive reward money and part of his motivation was to help the Hallak family. He did not want to return to San Diego to testify. What he had told the police in 1996 was true.

In March 2011, Detective Rydalch interviewed Waldon in San Diego County. Waldon said the only thing Shears had told him about the crime was that Shears had a bike and was supposed to be a look out. Waldon also said Shears had told him he had met with the suspects after the murder and they had discussed how to split the money. Shears said the suspects were mad at him because he was not where he was supposed to be. Waldon admitted that in 1996, he might have lied to protect his cousin, but he could not remember the details of his 1996 conversations with the police.

In August 2012, Shears was arrested in Riverside County. On August 23, the District Attorney of San Diego County filed a complaint charging Shears with the offenses of which he was eventually convicted. On August 24, San Diego Police Detective Timothy Faubel transported Shears to San Diego. During the trip, Shears asked what year it was. After Detective Faubel replied it was 2012, Shears said, "It's been 17 years and now this." Shears had tears in his eyes.

On August 24, 2012, Detective Rydalch interviewed Shears. When Detective Rydalch asked Shears how he got the gun, Shears said he had found it on the street, in the bushes.

In 2012 or 2013, a deputy district attorney and an investigator interviewed Waldon. Waldon said Shears had said he was on a bicycle, acting as a look out for the people who robbed the Moonlite Market. Shears heard gunshots and saw everybody run out of the store. They gave Hallak's gun to Shears. Shears showed the gun to Waldon and said, "This is the reason why it went bad." The gun was the one in the photograph the police had showed Waldon in his 1996 interview.

13

DISCUSSION

I.

*Pre-charge Delay*

A.     Background

Before trial, Shears filed a motion to dismiss for violation of due process and failure to preserve evidence due to prosecutorial delay.  In the motion, he argued the delay had prejudiced his ability to prepare his defense in that material witnesses had died or were missing, the memories of the remaining witnesses had been substantially impaired, valuable evidence had been destroyed or was missing and a crucial investigation was delayed.  The People opposed the motion.  The court reserved ruling until during or after trial.

During trial, defense counsel asked to have deleted from the transcript of Shears's April 1996 interview Shears's statement that he was at Young's home at the time of the Moonlite Market crime.  Defense counsel argued that because of the passage of time, Young could not be located, and this might lead the jury to believe that Shears's alibi was fictitious.  The prosecutor argued that Young had said that Shears was at Young's home between 9:30 a.m. and 9:45 a.m. and returned around 11:00 a.m., leaving Shears enough time to commit the crime.  Defense counsel's investigator then testified, out of the jury's presence, that she was assigned to the case in November 2012; in December, she was told to locate Young; in September 2013, counsel told her to subpoena Young; and about a week before trial, she learned that the National City police had issued an arrest warrant for Young on August 7.  The investigator testified concerning her efforts to find Young.

14

The court found "there had initially been some solid effort to locate [Young,] [b]ut during the . . . month preceding the trial, [there had been] little, if any, follow-up." The court therefore declined to redact the transcript.

After the jury found Shears guilty, defense counsel renewed the motion to dismiss. Defense counsel argued that Young had told Detective Lampert in 1996 that Shears had been with him at the time of the crimes; beginning several months before trial, there was an active arrest warrant for Young; and the defense was unable to locate Young at the time of trial.[6] Defense counsel concluded that but for the delay, "it is likely . . . Young would have been in a more cooperative spirit, as he had been when he agreed to be interviewed by Detective Lampert in 1996, and would have made himself available to testify as a crucial alibi witness."

The People opposed the renewed motion to dismiss. At sentencing, the court denied the motion. The court concluded as follows. The defense had not been diligent in searching for Young. Although there was no explanation for some portions of the delay, the delay was not purposeful or the result of a tactical decision. The investigation continued intermittently until Shears was charged. The new information obtained in 2005 (Mrs. Shears's later retracted statement that Shears said he was the planner and shooter) was significant and led to the charges. The jury would have considered testimony by Young that Shears was at Young's home at the time of the crimes in the

---

6       Shears made further arguments in the trial court that he does not pursue on appeal.

context of Shears's statements during interrogation that he was at the crime scene immediately before the crimes.  Thus, there was no actual prejudice.

B.     Discussion

Shears contends the negligent precharging delay of more than 15 years constituted a violation of due process; the delay caused alibi witness Young to be unavailable, prejudicing Shears; and the court erred by denying his renewed motion to dismiss.

A "[d]efendant's state and federal constitutional speedy trial rights (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15, cl. 1) are not implicated . . . until at least the defendant has been arrested or a charging document has been filed.  [Citation.]" (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250.)  "Although precharging delay does not implicate speedy trial rights, a defendant is not without recourse if the delay is unjustified and prejudicial.  '[T]he right of due process protects a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence.'  [Citation.]  Accordingly, '[d]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions.  A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay.  The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay.' "  (*Ibid*.)  "[If] the defendant fails to

16

meet his or her burden of showing prejudice, there is no need to determine whether the delay was justified." (*People v. Abel* (2012) 53 Cal.4th 891, 909.)

"The state and federal constitutional standards regarding what justifies delay differ. Regarding the federal constitutional standard, we have stated that '[a] claim based upon the federal Constitution also requires a showing that the delay was undertaken to gain a tactical advantage over the defendant.' " (*People v. Nelson*, *supra*, 43 Cal.4th at p. 1251.) Although "the exact standard under [the United States] Constitution is not entirely settled[,] [i]t is clear, however, that the law under the California Constitution is at least as favorable for [the] defendant in this regard as the law under the United States Constitution. Accordingly, we . . . apply California law." (*Ibid.*) "[U]nder California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process." (*Id.* at p. 1255.) Thus, "whether the delay was negligent or purposeful is relevant to the balancing process. Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Id.* at p. 1256.)

"We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them [citation]." (*People v. Cowan* (2010) 50 Cal.4th 401, 431.) Here, the trial court found that Shears had not met his burden of showing prejudice in light of the conflict between any testimony by Young that Shears was at Young's home

17

at the time of the crimes and Shears's statements that he was at the crime scene immediately before the crimes. This finding is supported by substantial evidence. In April 1996, Shears told the police he was not at the Moonlite Market "or around it" at the time of the robbery; at the time of the robbery, around 9:15 a.m. or 9:30 a.m., he was at Young's home.[7] In the same interview, Shears said he was at the Moonlite Market the morning of the crimes, "right before it happened," from "8:50 to 9:05," and after the crimes. Shears's own statements undermined any alibi testimony Young would have given at trial.

Moreover, substantial evidence supports the court's conclusion that the defense was not diligent in attempting to locate Young. After being told to find Young in December 2012, defense counsel's investigator found Young's mother's residence. The investigator telephoned the number listed for that address, but the number had been disconnected. In September 2013, when defense counsel told the investigator to subpoena Young, the investigator went to Young's mother's home and spoke with his mother, who said Young "comes around quite often." The investigator left her business card. When the investigator returned one week later, Young's mother said she had given him the card. The investigator left another card and did not return to the house or conduct any surveillance. The investigator unsuccessfully checked into two other possible addresses for Young and unsuccessfully contacted two of Young's associates after obtaining their names from Young's mother. The investigator knew of the

---

7    Young lived in the neighborhood of the Moonlite Market.

18

August 7, 2013, arrest warrant for Young, last checked to see whether he was in custody in early October, and never checked to see whether he was on probation or parole. Thus, factors independent of any delay by the prosecutor, including a lack of diligence by the defense investigator and Young's fugitive state, led to Young's unavailability.

Shears quotes *People v. Mirenda* (2009) 174 Cal.App.4th 1313, in which this court stated: "[A]lthough a federal speedy trial case, the reasoning in [*Doggett v. United States* (1992) 505 U.S. 647 [120 L.Ed.2d 520, 112 S.Ct. 2686]], is instructive on the issue of showing prejudice for analyzing either speedy trial or due process violations as the constitutional guarantees 'converge in protecting the same interest of the accused' for a fair adjudication. [Citation.] The court in *Doggett* noted 'that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown." [Citation.] And although time can tilt the case against either side, [citations], one cannot generally be sure which of them it has prejudiced more severely. Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment [speedy trial] claim . . . , it is part of the mix of relevant facts, and its importance increases with the length of the delay.' (*Doggett*, *supra*, at pp. 655-656.)" (*People v. Mirenda*, *supra*, at p. 1329 [26 year delay between filing of criminal charges and beginning of prosecution].) Shears concludes that the sheer length of a delay increases prejudice; thus, the lengthy delay here suggests that Young's unavailability should be attributed to the prosecution. This proposition does not take into

account the fact that Shears's own statements decreased Young's value as an alibi witness or the lack of diligence by the defense investigator.

The court did not abuse its discretion by denying the motion to dismiss.

II.

*Evidence of An Unrelated Crime*

A.     Background

Before trial, Shears filed a motion in limine to exclude evidence of his prior crimes, arrests, prison commitment and parole violations.  His prior crimes included a robbery he committed on April 19, 1996, at the Foodland grocery store in National City, two days after the crimes at issue, and to which he pled guilty in August.  In the Foodland robbery, Shears personally used the gun stolen from Hallak on April 17.  Shears's criminal history was a subject of various police reports and was mentioned in police interviews of Shears on April 26, 1996, and August 24, 2012, and in police interviews of Vasquez.  In his in limine motion, Shears argued that evidence he used Hallak's gun in the Foodland robbery was irrelevant and its introduction would "create substantial danger of undue prejudice and confusion of the issues."  The People opposed the motion, arguing that the date on which Shears possessed the gun was relevant to the issue whether he was the one who committed the April 17, 1996, crimes; Vasquez's identification of the gun as one Shears possessed on April 19 was more relevant than evidence the gun was found in the April 23 search of Shears's apartment, as April 19 was closer in time to April 17; the evidence was relevant to bolster Vasquez's credibility; and if Shears chose to testify, the evidence might be relevant to impeach him in that he had initially denied involvement in

20

the Foodland robbery and he had proffered several versions of how he came to possess the gun. The prosecutor intended to present the evidence at issue through (1) Vasquez's statement that when he saw Shears with the gun on April 19, Shears said he had used it to rob a woman that day and (2) Shears's statement in the April 23 interview that he had committed the Foodland robbery.

After a lengthy discussion, the court admitted evidence that two days after the Moonlite Market crimes, Shears had committed another crime with a gun. The court deemed too prejudicial for admission any evidence that the other crime was an armed robbery.

B.      Discussion

Shears contends the court abused its discretion under Evidence Code section 352 by admitting into evidence his admission that he used a gun taken during the murder and attempted murders when he committed an unrelated crime two days later. Shears further contends that this abuse of discretion violated his right to due process.

Evidence Code section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "We review for abuse of discretion a trial court's ruling to exclude proffered relevant evidence under Evidence Code section 352." (*People v. Fuiava* (2012) 53 Cal.4th 622, 663.) An abuse of discretion occurs only when the court's " 'ruling "falls outside the bounds of reason" ' " or when " ' "the court . . . exercise[s] its discretion in an arbitrary, capricious, or patently

21

absurd manner that result[s] in a manifest miscarriage of justice." ' " (*Ibid*, citations omitted.)

Here, there was no abuse of discretion. The court reasonably found that Shears's use of the gun in the April 19, 1996, crime was "highly probative" of his guilt in the April 17 crimes and the prejudice did not "substantially outweigh [the] probative value." Shears's possession of the gun just two days after the Moonlite Market crimes tended to show that he took the gun during those crimes, and the fact that he did not merely possess the gun on April 19, but also used it in a crime that day, added to the probative value. The court also properly found that the evidence was relevant to Vasquez's credibility. Vasquez testified that Shears made statements incriminating himself in the April 17 and April 19 crimes, and confirmation from an independent source that Shears had indeed committed the April 19 crime bore on the credibility of Vasquez's testimony as to Shears's commission of the April 17 crimes. The court's sanitization of the evidence, by omitting the violent details of the April 19 crime, removed any prejudice.

Clearly, Shears's due process rights were not implicated. In *People v. Fuiava*, *supra*, 53 Cal.4th 622, the California Supreme Court observed: "[A]s the United States Supreme Court recently stated, '[o]nly when evidence "is so extremely unfair that its admission violates fundamental conceptions of justice," [citation], [has the court] imposed a constraint tied to the Due Process Clause.' (*Perry v. New Hampshire* (2012) 565 U.S. _, _ [181 L.Ed.2d 694, 706, 132 S.Ct. 716] [citing, as an example, the constitutional prohibition against a prosecutor's' "knowin[g] use [of] false evidence," ']; see also id. at pp. _ - _[181 L.Ed.2d at pp. 706-708] [discussing cases in which due

22

process was violated by the admission of witness identification evidence that was developed through improperly suggestive police procedures that created a ' "substantial likelihood of misidentification" ']; *Jammal v. Van de Kamp* (9th Cir.1991) 926 F.2d 918, 920 ['Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." '].)"  (*People v. Fuiava*, *supra*, 53 Cal.4th at pp. 696-697.)

DISPOSITION

The judgment is affirmed.

BENKE, Acting P. J.

WE CONCUR:

McDONALD, J.

O'ROURKE, J.